With that, you may call the first case. Case numbers 13-59-75 and 13-62-80, Green Party of Tennessee et al versus Tre Hargett et al. Oral argument not to exceed 50 minutes per side. Ms. Kleinfelter will be the teller. Good morning. Good morning. Thank you, Your Honors. I'm Janet Kleinfelter with the Tennessee Attorney General's Office. And I'm here on behalf of the state. And Your Honor, I would like to reserve three minutes of my time for rebuttal. That's fine. You may proceed. I had the honor just on Tuesday of moving for admission one of our new attorneys into the Middle District. And it's always a great pleasure to do that. It is. Your Honors, as you're aware, this case, this is the second time this case has been before this court. And we are once again asking this court to reverse the decision of the district court. Both the judgment of the district court and its award of attorney's fees. And just to give you a very brief summary of the background, the plaintiffs, who are two minor political parties in Tennessee, filed suit making a facial challenge against Tennessee's minor party ballot access statutes, which at the time. On remand, the judge decided as applied. That is correct, Your Honor. However, there is absolutely no indication in the record that this is an as applied challenge. The complaint states it's a facial challenge. The complaint asks for relief. That is, the Supreme Court has characterized would be a facial challenge because it asks for relief that would enjoin application of these statutes with respect to all minor parties and not. By the time the case got down on remand, it was pretty clear that a facial challenge was not going to be accepted. And that the judge was supposed to be looking at it in more concrete terms. Well, Your Honor, actually, this court, in its decision reversing and remanding, specifically stated that this was a facial challenge. And the plaintiffs continue also to take the position that it is a facial challenge. They have not asserted in their briefs with this court that it is an as applied challenge, nor have they put any proof in the record that would demonstrate it is an as applied challenge with respect to them. They continue to take the position that these statutes should be declared unconstitutional and unenforceable with respect to all minor parties. All right, what would you call a challenge? And maybe it's a matter of semantics, but what would you call a challenge that says that in the context of Tennessee, a 2.5 requirement is unconstitutional in all of its applications in Tennessee? Your Honor, I would call that a facial challenge, because that is what the Supreme Court said with respect to the Washington Party case, that when, in fact, that's the stand for determining whether or not something is facially constitutional, is that the plaintiff has the burden of demonstrating that it is unconstitutional in all its applications, not just in the application with respect to that particular plaintiff. And that is the position the plaintiff has consistently taken throughout these proceedings, is that it is unconstitutional in all its applications. And the district court gave no explanation as to why it was treating it as an as-applied, simply said, I'm going to treat it as an as-applied, and then proceeded to say, 2.5% is unconstitutional, despite the fact that this court in its previous decision said, 2.5% is facially constitutional, and that you need to take that into consideration. No, but it's the difference between saying, look, that you can't come in and say, 2.5% is unconstitutional, that's it. That we know you're allowed to have percentages, and the question is, how does the percentage operate in context? And so the judge did look at how it operated in context, the context being Tennessee, the Tennessee electorate, the population of Tennessee, what it means. And so, I mean, we can talk about whether that's as-applied, or that's facial, or whatever, but that's clearly the directive of this court. And it seems to me that that's what the court did on remand. And your honor, I respectfully disagree. I think that what this court said was this was a facial challenge, and you're to look at it facially. And all the district court did was come in and say, again, 2.5% is unconstitutional, and therefore, any other statute that operates in combination with that 2.5% is also unconstitutional. But even if, excuse me, your honor. No, go ahead. I've got a different question. Let's assume we're going to go through an analysis, and weighing, and all the rest of it. As I understand it, you, notwithstanding any directive in the statute, everybody agrees that you use an office block system, not a party block system. Is that correct? I would say that it is a, technically, I would assume you would call it, yes, an office ballot. It's really hard to characterize it as an office ballot, because on the machines, the way they fit on the machines. But technically, yes, you would call it an office ballot versus, I mean, a party ballot versus an office ballot. You would call it a party ballot or an office ballot? Yes, they're listed on there by party and not by. Yes, they're listed by party, but you don't have, as I understand it, the ballot doesn't have all of the Democratic candidates, all of the Republican. That is correct. OK, it goes by office. OK, and it's also my understanding that there's a very easy threshold to get on the ballot. For independent candidates, yes, you're correct. OK, so this is my question. I don't understand, and I think I'm missing something. What is the difference, from the state standpoint, between having all of these independent candidates that can easily get on the ballot, and it has independent next to their name, and provided that the party agrees that this is the candidate, instead of that having Green Party? How does that affect the state in whatever way it is? Your Honor, I think, again, it goes back to the fact that recognition as a party, as a political party, brings with it more than just the fact that you're a candidate for this office. It brings with it recognition, as the Supreme Court has recognized, that you actually have demonstrated some modicum of support in the community for your existence as a party, and that you have certain benefits that an independent candidate doesn't have. You have the ability to go out there and engage in fundraising in ways that an independent candidate does not have. That is the difference, and it's that recognition that you're out there representing a party that stands for a number of different propositions, not just an independent individual who maybe stands for one proposition. And that is the difference, and it's a trade-off that the state has consistently applied, saying, we want to make it easy. Yes, if you want to run for office, we're going to make it easier for you to get on the ballot to run for office, if you think you want to be a candidate. But if you want to be a candidate of a political party, that party, not the candidate, but that party needs to demonstrate that it actually has support in the community to have that recognition as a political party. It's not, and really, to some extent, that's what the district court did, is that it contrasted or compared the requirements to get on the ballot of a candidate of a party versus political party recognition. And those are two different things, and it's comparing apples to oranges. Now, does it make a difference? My recollection is that by the time this matter was remanded to the district court, Tennessee had changed the regime. Absolutely, Your Honor. And so the district court's decision seems enlarged to still basis analysis under the old regime. There's not a lot of, or maybe any, evidence regarding the new regime in terms of severe burden on First Amendment rights and things of that nature. I mean, is there even enough in the record to determine whether this 119-day time period versus the 90-day time period is sufficient? All these other issues. Yes, Your Honor, absolutely. We think there is enough evidence in the record. The only, I mean, you're absolutely correct that the district court on remand made no attempt to evaluate the entire statutory scheme, but instead essentially went back to the same analysis that he had done the first time around and said it's still unconstitutional. The problem is under the new statutory scheme, which the plaintiffs are not challenging, all they have to do is file this petition 90 days before the election, 90 days before the general election. And that clearly falls within the parameters of what the Supreme Court said, both in American Party and in the Jennis versus Fortin cases, is entirely constitutional. Those parameters of 2.5 and 90 days before the general election. The evidence in the record. I'm sorry, go ahead. I'm sorry. No, no, go ahead, please. There is evidence in the record with respect to the April filing deadline for a political party that chooses to nominate, a minor political party that nominates candidates by primary. And Your Honor, one of the arguments we made is that the plaintiffs don't even have standing to challenge that anymore, because there's no evidence in the record that they want or intend to nominate their candidates by primary. They don't ever intend to use that provision. But if they do, if they do decide to nominate by primary, then the petition is to be filed by the April filing deadline. And that deadline, there is undisputed evidence in the record, that deadline is directly tied to the deadline that all states have to meet under federal law to mail out military ballots and ballots to overseas candidates. And the time that is necessary for the state to prepare and do all its administrative duties to prepare for the August primary election, which I will say is taking place today in Tennessee. And the August election is the largest election that takes place in an election cycle, because it is a county general election. It is a state primary election. It is a federal primary election. And in some instances, it is also a state general election. For example, today it is a state general election in that all state trial court judges, appellate judges, district attorneys, and public defenders are also on the ballot. As I understand it, I think the judge and also the plaintiffs are primarily interested in the 2.5% hurdle. In fact, I think their position is that without regard to when the filing deadline is, this is so onerous that it is unconstitutional. Now, can you give me some cases that have said that a filing requirement of the magnitude of 40,000 signatures is OK? Yes, Your Honor. In fact, in the American Party v. White case, the United States Supreme Court upheld a 1% signature requirement in the state of Texas, which is still in effect today. And that equals approximately 67,000 signatures in order to get on the ballot in the state of Texas. And the population of Texas? I can tell you what the population of Texas is. Similarly, in North Carolina, the Fourth Circuit Court of Appeals has upheld North Carolina's signature requirement. That's half. 1% is less than half of what Tennessee requires. Yes. And that's the problem when you start getting into percentages. Is that a beneficial site for Judge White's question? If 1% was upheld, these parties have to do double that. That is correct. But in the Jenna's case, the Supreme Court upheld a 5% signature requirement in the state of Georgia. That's the problem when you start comparing percentages with population amounts, that there's really not, again, you're comparing apples to oranges, and you can't. But what does the judge do wrong? The judge looked at evidence, received expert opinions, looked at the history, and came to the conclusion that 40,000 in Tennessee is just a burden that is almost insuperable and is unconstitutional. What's wrong with that analysis? That analysis was based upon the law before it was amended in 2012. That analysis was- Maybe we don't understand the law. I was under the impression that even if you go with a different nominating system, you need to present the signatures the day before the primary. Is that true or not? 90 days before the election, that is correct. OK, so you do need these signatures. And it seems to me that any modification in the statute in that regard is irrelevant unless one concludes that although it's too difficult to get the signatures by April, it's reasonable to get them by August. But if the signatures themselves is the problem, then really the change doesn't matter. And Your Honor, the only evidence in the record that the court relied upon with respect to a burden on the plaintiffs was general testimony. No testimony with respect to these particular plaintiffs, but general testimony as to what it takes maybe to collect to pay for people to gather signatures. And there's no evidence with respect to whether or not that applies in Tennessee. In addition, Tennessee places no restrictions whatsoever on the ability to gather signatures. There's no time limits. There's no requirements that if you sign a petition, you can't then also vote in a primary election. You don't have to. The signature gatherers don't have to be registered voters. We place no geographic limitations. And we have cited a number of cases in our briefs where federal courts have upheld statutory schemes with as much as a 2.5%, anywhere from a 2.5% up to the 5% signature requirement upheld by the Supreme Court, in which various restrictions have been placed upon the ability to gather signatures. Tennessee does not place any restrictions. It's only that 2.5% signature requirement. And again, that amount has been upheld by the United States Supreme Court. Excuse me? When were the restrictions removed? Tennessee's never imposed any restrictions on the ability to gather signatures. We have never placed any geographic temporal restrictions. We've never placed any sort of requirements with respect to the qualifications of who is collecting the signatures. Tennessee has never had restrictions on there. The only issue has been with the filing deadline. And I will say that in the prior case, the issue was the fact that the filing deadline was so early. And because they had to be nominated by primary, that requirement, the primary requirement, has been eliminated. They now simply have to file the petition 90 days before the election. In this court, even in the Blackwell versus Libertarian case, Ohio has a signature requirement that requires a greater number of signatures than Tennessee. And the issue in the Ohio case, though, was the filing deadline was the early filing deadline. Tennessee has eliminated that and has given minor parties two different avenues. And what the district court was supposed to do was to evaluate it in its entirety, the entire statutory scheme. And the district court didn't do that. Instead, the district court said, I'm just going to look at the statutory scheme as it existed prior to its amendment and still say that it's unconstitutional. Did the judge say that? Essentially, yes. He made no attempt to evaluate the April filing deadline in combination with the 2.5 signature requirement. He simply said, 2.5, again, is unconstitutional. And therefore, any filing deadline, whether it's 90 days or 119 days, is going to be unconstitutional. You made reference to the 5% signature requirement. Was that that Storer case? That's the Genes case. Genes versus Fortson out of the state of Georgia, in which the Supreme Court upheld 5%. Now, Storer versus Brown, the United States Supreme Court indicated that a signature requirement requiring as many as 300,000 signatures, depending upon the circumstances, could be constitutional. Which is also 5%, as I recall. I'm not sure what the percentage is. But they spoke more in terms of numbers, 300,000. They didn't have to reach that issue, because it was decided on other grounds. But they specifically indicated that as much as 300,000 signatures could be constitutional. Yeah, I think your brief says 5% that would require 325,000 signatures. There you go. You stand by that? Yes, Your Honor, I stand by that. I see that I'm out of time. We would respectfully request that this court reverse the decision of the district court and also reverse the award of attorney's fees. OK, thank you. You'll have your rebuttal time. Thank you. Counsel? If it's more convenient for you to address the court from a seated position, that's fine. Your Honor, the court deserves all the respect I can give it. And I will make my effort to stand here. OK, well, if at any point you feel that you would like to be seated, that's fine. I appreciate your consideration. I wish I could say as much for the parking lot next door with their handicap parking spots. I understand. May it please the court, Alan Winter for presenting the appellees in this case. I'd like to start. Judge Hoyt, you asked a question which troubles me whenever I have to deal with these kind of cases, and that is this distinction between the as-applied and the facial challenges, which become very difficult in elections law cases. And I think the default, which doesn't give a great answer. Could we start with confirming that this court did remand with the stipulation that the court look at it as applied? I mean as facial. In the initial case, the court described this as having been a facial challenge. In the judge's opinion, he sort of dealt with both versions without drawing a definitional distinction. I think for purposes of these kinds of cases, though. Has your client pled it as applied? It hasn't, has it? I didn't go back to the original pleading. We probably pled it as a facial challenge and argued it. The counsel tells us you did, and you don't quarrel with that. Yes, I mean, the literal reading of the words would have been read as a facial challenge. The evidentiary issues brought it into this kind of gray area of applied, and that's what I was going to answer Judge Hoyt's question. I'm sorry to take you off your time. No, that's fine. Go ahead, proceed. I'm finished asking questions, and I'd like you to go ahead if you want. All right, Your Honor. I think the issue comes when we start recognizing that the original cases and some of the cases that have been cited, American Party v. Texas, Folsom v. Janess, these were all decided long before the court set the standard for evaluating election law and election law challenges. And that is found in Anderson v. Celebrezzi, which was 10 years after Folsom v. Janess was reiterated in Burdick v. Takushi, I'm not even going to try to pronounce it, 1992. And this was, first we look to the magnitude of the burden that the law imposes. That has to be balanced against the necessity, the legitimacy, and the strength of the state interest. And when we get into this, we have to add, and I believe this is what you were getting at, Judge Hoyt, is we look at the totality of the state statute, not just the particular statute being challenged. And I meant really the totality election schema. For instance, there is a number, however rational, just pick a number for purposes of discussion. We've got 40,000 right now, signatures you have to get. 2.5% looks constitutional if you look at a bunch of other cases that have said it is. But we have to deal, and we raised the issue in context. It's never happened in Tennessee in rational times. The last time a party qualified for the ballot was in 1968, 69 maybe, George Wallace's American party. It was, given the times, a totally racially motivated get the signatures. So when that happened, that was based on signatures, not voting, right? Wallace got on the ballot by submitting signatures. It was filing petition signatures. And I believe the same statute was in effect. They could satisfy that this was the anger of the Civil Rights Movement and George Wallace. I don't even know. I think it was back in the 30s that any other party has qualified. Was there testimony or affidavit? I'm not sure what type of a record was made. But was there evidence submitted as to the plaintiff's attempts to collect those signatures, when they started, how many they garnered, and? No, the evidence regarding the actual burden was primarily economic. And that is, what would it cost to do this? And it was based on both expert testimony as well as published documents and research studies and things like that. But what about the possibility of volunteers? I mean, why would we assume that you're going to have to pay for every signature? Again, this goes to, and this was evidentiary in research studies on the basis of getting the X number of signatures. What are the practical implications? It also goes back to the early April filing deadline. And let me kind of call this a distinction, because we have the old case and the new case with the new law. Many of the cases dealing with the unconstitutionality of an April filing deadline, and some of them dealt with a March filing deadline, were they cited the virtual impossibility of really getting volunteers involved that far in advance of election. And they held them unconstitutional because of the difficulty of getting people motivated, getting interest out there. And just a brief one on the 90-day thing. The council has pointed out. Mr. Woodruff, your sister council talks about the purposes for all this distinguishing between a candidate and the recognition of a new political party, a minor party in this case. And so the idea isn't as outrageous as you kind of make it out to be, because you'd have to have that many citizens of the state who would take an interest to form a new political party. So 2.5% or the 40,000 signatures doesn't sound. But we measure it by cases. And there are cases that say, this is within the realm of reasonableness. Tennessee's 40,000 is, at least on the last set of figures I've seen, and this is a year and a half ago, the fourth most difficult in the country. And in proportion to population, it's number one. Now, the point that I was getting, and I hope this will answer you. Does it have to be in proportion to the population? I mean, there's no case law on it. But certainly, I think we can agree that requiring the same number of signatures in California and Tennessee is not justification for saying that the Tennessee statute is OK because it's OK in Ohio. It's easier to get 400,000 signatures in California than it is to get 40,000 signatures in Tennessee. But the point I was getting to, and there's two of them, one is when we're weighing or determining the constitutionality of a statute, it is totally appropriate to look to history. And this court, I think, cited that in Libertarian v. Blackwell. And the fact that nobody's been able to satisfy the Tennessee statute since George Wallace and before then, I'm not sure how long, but I think it was 30 years, is itself certain evidence. Now, going back to your point, there were, in fact, I believe, because remember, we have the Constitution Party and the Green Party, our party system. The Constitution Party, I believe, did do a signature effort. I believe it was leading up to 2010. It's in the court's opinion, and I don't remember what it is. But it cited, I think it was 10,000 or 12,000 signatures that they had managed to get. And the court cited also to something with the Green Party, and I can't remember the numbers. It may even have been references to the fact that the Green Party has qualified in so many other states that, yes, these parties have established that they have a modicum of support based on what they did. I can fill in the actual numbers if the court wishes to have any supplement on that point. But going back to the question of the impact of the April filing deadline, and I will get to the distinction between parties and candidates in just a moment. Council has pointed out how much work the state has to do before an election to satisfy the National Voting Acts and getting all the ballots put to the other. Therefore, 120 days before the August general and the August primary is perfectly OK. Except that the statute, by the statute, the legislature has says 90 days before the general election is all you have to do to qualify. So the legislature has determined that 90 days is enough, making this 120 days too far, too difficult. And again, we have a timing thing. Now, I'm going to point out one thing. Isn't there a different ballot? I mean, the primaries that are going on today, today they're having general election for some state offices and primaries for other offices, federal and some other state ones. So the April filing would be 120 days before the elections that are going on today. If a minor party wanted to nominate its candidates by primary, it would have had to qualify in April, 120 days ago. And this is what the judge was saying. It's too far in advance. It's too early. It's before people are interested, et cetera. I want to raise one point. When the court remanded this case, remember it didn't make a decision on the merits. It remanded it to say, OK, we've got a new law. What's the difference? Technically, the new law gave the Green Party and the Constitution Party everything it wanted. It gave them the April or the end of August filing deadline, the 90 days short. It mooted the case. And so they didn't have a concern about the second prong of the new law. That was argued largely because we had to get sent back, court said to. And the judge did, as Ms. Kleinfelder has pointed out, basically analyze that under the same parameters that he applied in analyzing the original case. Because in the original version, I should say, that was the sole issue. That was the number and the filing date. Now, going to your question, what affects a candidate and what affects a party are not inherently different. And it's particularly true in Tennessee, and this is why. Once a party becomes qualified in Tennessee, they can only retain qualification if one or more of their candidates reaches a certain threshold of voting performance. And this court has specifically noted the importance of having a party affiliation identifying a candidate on the ballot in getting votes for them, which means that having the party affiliation is an important consideration in it being able to retain ballot qualified status. And this, again, goes to the weighing factors. First of all, what is the damage of not being a qualified party? Well, this court has already determined the voting queue that goes with having a party affiliation is significant. Party doesn't qualify. Candidates don't have that voting queue. Now, however heavy that burden is, let's separate that one for discussion purposes from the 42,000 signature requirement. Under Anderson, we have to weigh that against the strength and legitimacy of the state's interest. Well, what is the state's interest in not allowing somebody to have their party affiliation identified on the ballot? We already know, as Judge White has pointed out, and I believe Judge Cook also noted, that it's easy to get on the ballot. 25 signatures and anybody's on the ballot for US representative or state office, anybody can get on it. So this modicum of support is not a threshold problem. In the election preceding the judge's last decision, they had, I believe, it was 13 candidates for governor on the ballot. I don't know how many it is right now, but it's probably going to be a very similar kind, with no problem. So it's not creating a problem with the ballot. There's no voter confusion issue. Don't know why. So the only implication of the petition signature requirement to qualify a party is that it changes whether the candidate gets to use the party name. And that is clearly burdensome. It burdens the party's ability to stay on the ballot. It burdens the candidate's ability to get votes. And there is no offsetting state interest. Now, I want to, excuse me. You probably need to sit down. It would be fine if you would sit down at this point. Absolutely. I got 37 seconds. We'll give you, we'll have another couple of minutes here. OK. Now, the other thing, remember, I was saying, we need to focus on Anderson Burdick's test. I hate to interrupt you. Would you not want to sit down now? It's up to you. I'm here. For the record, I still respect the court. We understand that. We absolutely understand the respect of the court. Just take your time, and you'll have your allotted time in a little bit more. There you go.  Thank you. Great. So why don't we say two more minutes? Would that work? I will do my Yankee imitation, speak as fast as I can. OK. I'll take it out of the way. Sure. One of the problems we're facing,  particularly when there were other states that have adopted higher standards of voting, percentages, is, and this goes back to what Judge White currently observed, you need to deal in context. In our brief, we've laid out some of these things. But, for instance, I believe it was a 3% that the 11th Circuit approved. It approved it because the number of petition signatures required by a party was exactly the same as it was required by an independent candidate. That's not the case in Tennessee. An independent candidate gets only 25 signatures a party requires 40,000. So we're really comparing apples and oranges when we look to the cases that the bill has cited. Can I ask you one question? I know your time is short. You argue that this ballot order issue that you have, the evidence seems to be on both sides in terms of the extent to which voting behavior is impacted by the order in which parties are listed. Do you have any, the district courts seem to pick just one side of the debate. Well, not quite. Okay. You're two-thirds correct. Okay, well that's better than I am usually. And I'm giving you more credit than I normally do. Okay, all right. There are clearly studies that say there is a positional bias. There are also studies that say there's no, it doesn't statistically prove a bias. There are no studies that at least I've been able to identify and I will candidly say the judges, law clerks, did a better job of researching this than I did. He pulled out a bunch. There are no studies saying there is no bias. So there is either maybe or definitely. Now, what is the state interest? Anderson test again. What are we balancing this against? The state has absolutely no interest in putting the party in power first on the ballot. So I guess I understand that you're arguing that this Anderson-Burdick severe burden test should apply here. This court has said that basically in the whole spectrum of election law cases, that was Obama v. Hosta in 2012, was it, I believe. So that was pretty much the end of it. And yes, under Anderson-Burdick, I believe in both cases, the district judge ruled properly. But to more fully answer your question, if you go back to the judge's opinion, he does specifically cite to how the Supreme Court has come down in favor of adopting the results of those studies that show a bias. Now, the decisions he cites were not based specifically on that. So it was dictated to that extent. But it was certainly a Supreme Court endorsement and the district court relied on that. Are you saying that they have to, what do they have to do, rotate? I mean, what are you saying the state has to do? What the judge initially ordered, that was the first time around, was simply a random drawing. And rotating, I suppose, would be certainly better than what you had, that the party in power always gets the top spot. Rotating, by definition, means that minor parties at some point have a chance, even if it's structural, guarantees that they're going to be at the top spot sometime. Random drawing doesn't ever guarantee them the top spot, but it means that they have an equal opportunity to get it. So we had no problem with requiring a random drawing, but a rotating system would probably be the more guaranteed fare. And you feel that this is necessary even if you get your party designation? I'm sorry, what? That some sort of adjustment to ballot order is necessary even if you win on the party designation issue? Yes. Now, let me fill you in on a little side issue. Can I have one minute? Time has well expired, but if you could be pretty brief. The state, right after the last decision, the state passed a new law saying you've got to qualify as a statewide party in the immediate election right after you're on the ballot, which means we had to do it in 2012. I'm sorry, what did it say? It said when a new party qualifies by petition, you have to satisfy the requirements to become a statewide party, that is, some candidate has to get 5% of the vote in the immediately following election. In a separate case, which somebody's going to hear soon, the court decided that was unconstitutional, doesn't give parties time enough to grow. But that was an interim thing that threw a whole rickle in, because if we only had one election to do it, we would definitely want the opportunity to be first on the ballot. Does that answer your question? Yeah. OK, thank you. My apologies. Oh, no, no apology necessary. There are a lot of issues, a complicated case, and we appreciate your advocacy today. Ms. Kleinfelter, you have some rebuttal time. Thank you. And I'll just briefly address this last issue. As Judge White has recognized, party affiliation has been recognized as the single most important factor with respect to the position on the ballot. More importantly, all of the studies that were relied upon by the district court, and virtually every study, while it may or may not have found bias, and I would agree that the district court really only looked at one side of the debate, on both sides of the debate, virtually all of the studies have said, while it may exist, we don't find any evidence of it existing in partisan general elections. And the ballot statute, the ballot order statute that's been challenged here, only deals with a ballot in a partisan general election. So we would submit there's simply no evidence in the record whatsoever to demonstrate that there has been any burden placed upon the plaintiffs that would substantiate declaring this statute unconstitutional. So you're saying that the testimony or the experts talked about partisan elections, not partisan ballots? There is no testimony in the record with respect to ballot order. The studies focused upon ballots in primary elections or in non-partisan general elections. But virtually all of the studies, and particularly there's one study that the district court relied upon, I can't call it to name, but even in that study, and we actually cited it in our brief, the author of that study said that there really is little to no evidence of positional bias in partisan general elections. Because in a partisan general election, the candidates are identified by party affiliation or as an independent candidate, and that is the single most important factor. People don't go to the ballot, people go to the ballot in a partisan general election looking for the Green Party candidate, the Democratic candidate, the Republican candidate, or the independent. Where there may have been evidence of positional bias is in primary elections and in non-partisan elections. And the statute in question only applies to partisan general elections. Briefly, I wanted to get back to one of the questions, actually, Your Honor, also asked with respect to where courts have upheld other signature requirements. On page 31 of our brief, we cited cases from the 3rd, 4th, 10th, and 11th circuits, as well as the district court in Rhode Island, where the courts upheld either percentage requirements or numbers of signature requirements that are in excess of Tennessee's requirement. And of course, Rhode Island, for example, upheld a 5% signature requirement. Their population is significantly less than the state of Tennessee. For example, Oklahoma is another one which upheld a 5% signature requirement. They also have a population that is less than Tennessee's. But again, it all goes to show that you really can't compare. And I think it's actually what the Supreme Court said in the American Party, that any percentage or numerical requirement is going to be necessarily arbitrary. What we have is that the Supreme Court has upheld percentage requirements as much as 5%. Didn't it also say that 22,000 was on the outside of what was That was in 1974 in the state of Texas. That percentage requirement is still in effect today, and which is now in the neighborhood of 67,000 people. For example, North Carolina has been upheld. It is a 2% signature requirement equaling 51,000. Almost 52,000. So again, I don't really think you can compare percentages and signatures. Is it significant that no Well, Your Honor, that's because no one has tried. And I will tell you that the history that the District Court relied upon, the 1968 decision, I mean the last time someone was on the ballot in 1968, Tennessee at that time had a 5% signature requirement. And the American Party got on the ballot in 1972, it was reduced to 2.5. During that time period, no one has tried. The evidence in the record is that the Green Party has never tried. And the evidence that the District Court relied upon with respect to the Constitution Party, there, it was from a previous case, not actually in the record in this case, the Constitution Party had submitted in the neighborhood of 15,000 signatures by October of the year before the election, and then stopped. And there's no, and the reason why they said they didn't submit anymore is because they didn't think they could meet the April filing deadline. We don't have any history in the record under the new statutory scheme. All the old statutory scheme with an April filing deadline. We don't have any history now of if it's possible with an August filing deadline, as you heard counsel talk about and as the courts have said, volunteers and people may not be interested in January, February, March, but come June, July, and August, they may be interested. They may be very well interested given that you've got primary elections and general elections coming up at the beginning of August. And again, what is the state's interest in making it so, so, so very difficult? And your honor, we would submit that it's not difficult. There's no evidence in the record to show that it is difficult. What the evidence shows is that the parties haven't tried in Tennessee. They have tried in other states and have been successful in other states that have had as difficult a requirement as Tennessee has, which again we submit is not difficult. And the Supreme Court has said that states unequivocally have the right to require a political party to demonstrate a modicum of support in the community. And I would suggest that 40,000 or less signatures is not is not difficult given that Tennessee has a population of over 6 million people. You can't come in with 40,000 signatures. I mean they have to be 40,000 registered voters don't they? They do have to be registered voters and Tennessee has over 4 million registered voters. You need a big cushion. So you really need 60,000 signatures. That evidence is not in the record, your honor as to how many signatures are needed. Again, we would respectfully request that the decision of the district court be reversed. Thank you. Okay, thank you counsel. We appreciate your arguments today, both of you. Thank you very much for appearing today and for your briefing as well. More than welcome. The case will be submitted and you may call the...